W. Brown Morton v. Commissioner. W. Brown Morton and Lucie T. Morton v. Commissioner.
Morton v. Commissioner
Docket Nos. 56529, 56530.
United States Tax Court
T.C. Memo 1957-101; 1957 Tax Ct. Memo LEXIS 149; 16 T.C.M. (CCH) 420; T.C.M. (RIA) 57101; June 25, 1957
Floyd F. Toomey, Esq., for the petitioners. Thomas E. Tyre, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion In Docket No. 56529 respondent determined a deficiency in Federal income tax for the year 1947 against petitioner W. Brown Morton in the amount of $7,376.83, while in Docket No. 56530 respondent determined deficiencies in income tax for the years 1948, 1949, and 1950 (for which years joint returns were filed) against petitioners W. Brown Morton and *150 Lucie T. Morton in the respective amounts of $5,088.44, $6,671.10, and $245.28, together with additions to tax under section 294(d)(2), Internal Revenue Code of 1939, for the years 1949 and 1950 in the respective amounts of $793.05 and $396.94. Under the pleadings herein, the issues have to do with the deductibility in 1947, 1948, and 1949 of legal expenses paid in connection with litigation contesting the tax liability of W. Brown Morton for the years 1942 and 1943, and the deductibility of losses incurred during 1947, 1948, and 1949 in the operation of an agricultural enterprise. The cases were consolidated for hearing and opinion. Findings of Fact Petitioners W. Brown Morton and Lucie T. Morton are husband and wife who reside, and during the years involved herein resided, in New York City, New York. For the year 1947 petitioner W. Brown Morton (hereinafter sometimes referred to as petitioner) filed a separate income tax return with the collector of internal revenue in New York City. For the years 1948 and 1949 petitioners W. Brown Morton and Lucie T. Morton filed joint income tax returns with the collector of internal revenue in New York City. Petitioner W. Brown Morton *151 is and has been for many years a patent attorney practicing patent and trade-mark law in New York and Washington, D.C. During the taxable years 1947, 1948, and 1949 he received income from the partnership Pennie, Edmonds, Morton and Barrows in the respective amounts of $62,458.44, $50,542.38, and $62,767.03, and during those years devoted most of his time to his profession except for occasional short vacations and week ends. The petitioner was born and raised in Virginia. In 1929 he purchased two tracts of land in King George County, Virginia, each consisting of about 150 acres. There was an intermediate tract of about the same size between them which he hoped to acquire later. On what was called the primary tract there was a 12-room residence, a barn, and one or two other buildings. The petitioner remodeled the residence, built a tenant house, a service house, and a 4-car garage. This tract consisted of about 40 acres of cleared land and the rest was wooded. On what was called the second tract there was a farmhouse and barn and the usual buildings of a family-operated farm. About 60 acres of this tract were cleared. Petitioner acquired these properties with the expectation of retiring *152 there, and he was endeavoring to get enough property to have a fair-sized farm for general operations. That is why he bought the second tract and had expected later to acquire the intermediate tract. For financial reasons the depression changed his plans for retirement, and he never acquired the intermediate tract. The petitioner's family lived in the residence on the primary tract practically every summer since it was acquired. They would also frequently occupy the place at Christmastime. From 1929 to 1942 substantially all of the activities were devoted to keeping the properties in order, fencing, clearing of underbrush, fixing the roads, and otherwise maintaining the properties. During that period petitioner had two different tenant farmers who lived on the second tract, and except during the war years he had a caretaker who lived on the primary tract. Up to 1942 the petitioner did not undertake any farming operations for profit on either of these tracts, nor did he deduct in his tax returns any expenses in connection with them. In 1942 petitioner entered into a sharecropping agreement with a new tenant under which the petitioner furnished all seed, equipment, and working *153 stock and the tenant furnished the labor. While this tenant put in some time on the main tract, the onshares arrangement related exclusively to the operations on the second tract. That operation was involved for the years 1942 and 1943 in Docket No. 13737 before this Court, in which case it was held that petitioner was not engaged in operating a farm for profit and, therefore, could not deduct so-called farm losses. Petitioner sold this second tract in 1944, and during the years 1947, 1948, and 1949, which are involved here, he owned only the primary tract. In 1947 the petitioner embarked upon a project on the remaining primary tract of growing flowers out-of-doors for the wholesale flower markets. This is an established business in the section of Virginia where the petitioner's property is located. The project was undertaken at the suggestion of and in collaboration with a Griffith Jones who had been a captain in the Marines during World War II. He was a college graduate, and the petitioner had known him before the war in New York where he had been in the insurance business. Jones was a friend of George Heath who has a well-known daffodil project near the petitioner's property *154 in Virginia. He had put in a lot of time studying the literature on flower culture and had visited with his friend Heath. In the spring of 1947 Jones called upon the petitioner in New York to see if he could interest the petitioner in embarking on a project on his place similar to the Heath operation. The petitioner went with Jones to Heath's place several times where the matter was discussed. Heath came up to the petitioner's place. Soil tests were made on petitioner's property. Petitioner was impressed with Jones's enthusiasm and his optimism as indicated by his willingness to give up his job in New York and move down to Virginia and undertake the project. The petitioner decided to back Jones in the flower venture. It was decided to raise daffodils, peonies, and chrysanthemums because their respective blooming periods extended periodically from early spring until the fall. The arrangement was that Jones, with his family, would occupy the tenant house on the property. The petitioner furnished the equipment and paid all expenses. He paid Jones a salary and opened a bank account for him at the King George Bank. Jones moved in around the first of June 1947 and took over the entire *155 operation. The project was started by the purchasing and planting of 30,000 daffodil bulbs, 3,000 peonies, and 1,000 chrysanthemum plants. The original planting of the 30,000 daffodil bulbs (exclusive of the peonies and chrysanthemums) covered about an acre or 44,000 square feet of ground. Daffodil bulbs multiply after the original planting. After the blooming period each year, the bulbs are dug, claned, dried, divided, and replanted. Due to the multiplication or dividing process, it was anticipated that the acreage would about double each year. After a sufficient acreage is attained it may be expected that the market for bulbs would yield as much as the blooms. Peonies start from tubers. It is likewise customary to dig them up every year or two. The tuber has "eyes" on it and is divided and replanted much like a potato, and in that way the original acreage is extended. Chrysanthemums start from plants. After they have bloomed in the fall they are taken up, young shoots are taken off, planted in boxes and kept in a greenhouse over the winter, and replanted the next year. For the flower project petitioner bought a hand roto-power tractor, a roto-tiller, a soil pulverizer, a station *156 wagon, and a substantial quantity of trays for drying the bulbs. In addition, there were purchased watering troughts for hardening the flowers, hose for watering the crop, and boxes and paper for shipping. Stationery and billheads were printed. Substantially all of the operations, such as the planting, the taking up of the bulbs and plants, and the cutting of flowers were done by hand. Outside labor was necessary during some of these operations. Jones secured lists of wholesale florists in the eastern cities and undertook to make arrangements to ship flowers to those florists. Of the flowers that were sold, some were shipped to New York and Detroit, but most of them were sold and delivered by station wagon to wholesale florists in Washington. In the wholesale market early blooming daffodils sell for 50 cents to 75 cents a dozen. The average price for a whole season would average between 25 cents to 35 cents. The petitioner estimated that at an average price of 25 cents a dozen he should make from $1,200 to $1,500 an acre. Peonies were priced from $1 to $2 a dozen. The price of chrysanthemums was variable depending upon the variety. By the multiplication process it would be possible *157 to expand the business to the extent that the market could absorb the flowers. When petitioner made the arrangement with Jones he was not particularly interested in flowers and had never engaged in the raising of flowers as a hobby. He was not related to Jones and was under no obligation to him aside from mutual business considerations. Petitioner's purpose in undertaking the project was to build up an operation similar to the George Heath business. With 40 acres of cleared land on which to expand he anticipated the development of a substantial business. The operation was undertaken with the expectation of profit. Petitioner as a practicing lawyer in New York and Washington was not in a position to handle the project himself. Its success or failure depended upon the competence of the manager in charge. The arrangement between Jones and the petitioner did not prove satisfactory and on May 1, 1948, after 11 months from the beginning of the project, Jones became discouraged and quit. Petitioner thereupon advertised in several newspapers for another manager. This effort being temporarily unsuccessful, petitioner in July 1948 employed one T. V. Jones, a man who lived nearby, to take *158 over. He had had no special training in flower culture but the bulbs had to be dug and the operation had to be carried on until a permanent successor could be found for Griffith Jones. That situation continued until March 1949. As a result of an advertisement, the petitioner in March 1949 finally employed a man named Singletary, who had been on the greenhouse staff at the Quantico Marine Base. He had had no experience in the marketing of flowers, but he was an experienced hand at growing flowers. Singletary came and lived on the place under arrangements substantially similar to those originally made with Jones. He stayed for a year or until March 1950 when he quit to accept a position as superintendent of the grounds at the State College which is located in Fredericksburg. By March of 1950, when Singletary left, the petitioner concluded that without someone on the farm who would really stay and make a go of it the project would not be successful. He thereupon abandoned the operation. Petitioner has not claimed as deductions any expenses or losses with respect to the property since 1949. The income and expenses attributable to the flower and bulb operation for the years indicated *159 are shown in the following statement: W. B. Morton
Statement of Income and Expense
from Flower and Bulb Operations
1947 1948 1949
1947
Sale of flowers and bulbs
$ 262.25
Expenses
Labor
$1,691.24
Supplies and fertilizer
497.07
Bulbs and plants
2,284.93
Gas and oil
172.33
Auto insurance
102.00
Total expense
4,747.57
Net loss
$4,485.32
1948
Sale of flowers and bulbs
$ 564.26
Expenses
Labor
$2,852.71
Supplies and fertilizer
322.84
Bulbs and plants
54.24
Gas and oil
239.53
Auto insurance
102.00
Total expense
3,571.32
Net loss
$3,007.05
1949
Sale of flowers and bulbs
$ 462.80
Expenses
Labor
$3,599.85
Supplies and fertilizer
0
Bulbs and plants
0
Gas and oil
271.67
Auto insurance
102.00
Total expense
3,973.52
Net loss
$3,510.72 Respondent disallowed as a deduction any losses attributable to the operations on the farm during the years 1947, 1948, and 1949. The expenses shown above were ordinary and necessary expenses paid in carrying on the business of raising flowers and bulbs undertaken by the petitioner for profit. In his income tax returns for 1942 and 1943 the petitioner *160 deducted losses sustained in certain operations on the second tract which was sold in 1944. The respondent disallowed those deductions and issued a notice of deficiency. The petitioner filed a proceeding before this Court under Docket No. 13737. By a Memorandum Opinion filed on May 28, 1948, this Court sustained the respondent's determination. The petitioner appealed to the Court of Appeals for the Second Circuit, which Court on April 22, 1949, affirmed the decision of the Tax Court. The Supreme Court denied certiorari. In connection with the proceedings described above the petitioner paid attorneys' fees and related expenses on the dates and in the amounts shown below: December 30, 1947
$1,200.00
June 5, 1948
750.00
August 25, 1948
250.00
March 4, 1949
756.88
November 9, 1949
788.09
Total
$3,744.97 No part of the foregoing fees and expenses was allowed as a deduction by the respondent. Opinion KERN, Judge: Respondent on brief concedes the deductibility of the legal expenses here involved in the years in which they were paid. However, he correctly points out that they are deductible from adjusted gross income rather than from gross income. With regard *161 to the deductions claimed by petitioners on account of losses sustained by them during the taxable years in the operation of an agricultural or horticultural enterprise, carried on by them on a small part of their farm in King George County, Virginia, respondent makes two arguments in support of his disallowance of these deductions: (1) That by reason of our decision in W. Brown Morton, (Memorandum Opinion, filed May 28, 1948) Docket No. 13737 [7 TCM 314,], affd. 174 Fed. (2d) 302, certiorari denied 338 U.S. 328, petitioners are collaterally estopped from contending that they were in the business of operating a farm for profit or engaged in the production or collection of income or the management, conservation, or maintenance of property held for the production of income during the years 1947, 1948, and 1949; and (2) that, apart from any consideration of the doctrine of collateral estoppel, petitioners have failed to prove that they were engaged during the taxable years in the business of operating a farm for profit or engaged in the production and collection of income or in the management, conservation, or maintenance of property held for *162 the production of income and, therefore, the expenses in connection with their agricultural activities must be considered as personal expenses not deductible under either section 23(a)(1) or section 23(a)(2) of the Internal Revenue Code of 1939. Respondent's first argument is without merit. The cited Memorandum Opinion of this Court [7 TCM 314,], contended by respondent to be the basis for collateral estoppel, involved a question totally different from that involved in the instant case. It had to do with a different agricultural enterprise (general farming) carried on in different taxable years (1942 and 1943) on a different tract of land (not owned by petitioners during the years here involved) through a different agent (tenant farmer) employed under a different type of contract (crop sharing). While a reference was made in the exhaustive opinion written by Judge Harlan in that case to testimony by the taxpayer "as to growing some cut flowers for the market subsequent to the taxable year," it is evident to us that the particular (and peculiar) agricultural enterprise here involved was not and could have been in issue in that case. We also reject respondent's second *163 argument advanced on the merits. Upon the entire record, we are convinced that petitioner W. Brown Morton was engaged in good faith (although perhaps unwisely) during the taxable years in the business of raising cut flowers, bulbs, and plants from the sale of which he expected to make a profit, and that this activity was not his hobby or recreation. He was not personally interested in flowers and, if he had been, the raising of daffodils in wholesale lots, which bloomed when neither he nor his family were on the farm, could not have satisfied such an interest. When it became apparent to him that he could not make a profit from the enterprise, he abandoned it. Respondent makes a strong argument that petitioner could never have reasonably anticipated a profit from the enterprise and, therefore, cannot be considered as having engaged in this activity during the taxable years as a business. We are unable to agree. While an experienced horticulturist might not have reasonably anticipated a profit from the enterprise, it does not follow that a patent lawyer practicing in New York and Washington, who had been born and reared in Virginia, would not have anticipated profits within a reasonable *164 time from the operation of such an intriguing enterprise as a flower ranch or peony plantation. Decisions will be entered under Rule 50.